964 So.2d 642 (2006)
Leo E. JOSEPH
v.
MTS INVESTMENT CORP.
1050541.
Supreme Court of Alabama.
December 8, 2006.
Rehearing Denied March 23, 2007.
*643 W. Scott Simpson of Batchelor & Simpson, P.C., Birmingham, for appellant.
Oliver J. Latour, Jr., Foley; and Daniel G. Blackburn and Cynthia J. Sherman of Blackburn & Conner, P.C., Bay Minette, for appellee.
NABERS, Chief Justice.
Leo E. Joseph sued a group of Orange Beach property owners seeking specific performance of a real-estate contract in which the property owners had agreed to sell him 14.5 acres of undeveloped property in Orange Beach. Following the close of Joseph's case-in-chief in a nonjury trial, the trial court entered a judgment in favor of the property owners. Joseph appeals. We affirm.

I.
On May 29, 2004, Joseph submitted a contract, offering to purchase from MTS Investment Corp., Paul L. Smith, M.H. Smith, Jr., Ora Lee Smith, and James H. Massey ("the property owners") 14.5 acres the property owners owned in Orange Beach. The offering price was $580,000. On June 28, 2004, the property owners accepted the offer and executed the sales contract. The sales contract contained the following provision:
"Closing & possession dates: The sale shall be closed and the deed delivered on or before September 1, 2004, except seller shall have a reasonable length of time within which to perfect title or cure defects in the title to the property."
The contract also contained an Addendum A. Addendum A stated, in relevant part:
"Feasibility study: Buyer shall have 90 (ninety) days to review all aspects of the property, including, without limitation, all governmental, environmental, zoning, soil, and utility services matters related thereto. If buyer notifies seller and broker in writing within 90 (ninety) calendar days after this instrument becomes a binding agreement that buyer is not satisfied with the results of such review, then this agreement shall automatically terminate and seller shall promptly refund the earnest money to buyer. If buyer fails to provide said *644 notice, then this contingency shall be deemed to have been waived by buyer. Seller acknowledges and agrees that buyer and/or his agents and employees may have free access during normal business hours to visit the property for the purpose of: (1) inspection thereof; and (2) conducting such soil and other tests thereon as are deemed reasonably necessary by buyer. Buyer hereby agrees to indemnify and hold seller, broker, and broker's affiliated licensees harmless from and against any and all loss, injury, cost, or expense associated with buyer's inspection of and entry upon property."
Finally, the property owners attached to the sales contract a typewritten list of "conditions of acceptance." Those conditions provided that Joseph's earnest money ($10,000) was nonrefundable and would constitute liquidated damages if the closing on the sale of the property did not take place. The list of conditions was signed by all the parties. Handwritten beneath the signatures was the following statement: "Purchaser has 90 days to close under the terms of the contract including addendum A." This statement was followed only by Paul L. Smith's signature, dated June 28, 2004.
Joseph thereafter endeavored to perform a due-diligence investigation on the property, as contemplated by Addendum A. On July 5, 2004, Joseph's agent, Arthur Follenius of Tratin Development, LLC, went to the property to begin survey preparations. Follenius attempted to enter the property by way of a cul-de-sac in the Terry Cove Harbor subdivision, which was adjacent to the property; however, he was forcibly prevented from doing so by a member of the Terry Cove Property Owners Association ("the TCPOA"), who contended that none of Follenius, Joseph, or the property owners had the right to traverse the cul-de-sac. Subsequently, there was a dispute between the TCPOA and the property owners as to whether the property owners retained an access easement to the property through the cul-de-sac. The property owners had a recorded plat that identified the easement through the Terry Cove Harbor subdivision, but the TCPOA nevertheless refused to recognize it.
Because there was no access to the property other than by way of the cul-de-sac, Joseph was prevented from conducting any further due-diligence investigation on the property until approximately August 20, 2004, when the TCPOA agreed to grant Joseph limited access to the property to conduct his due-diligence investigation. However, the TCPOA continued to refuse to recognize the recorded easement and stated that it would recognize the easement only after Joseph submitted to the TCPOA an acceptable development plan for the property he was planning to purchase.
On September 10, 2004, Joseph and his attorney met with Paul Smith, who was handling the transaction on behalf of the property owners. The parties agree that, at this meeting, they discussed the ongoing easement problem they were having with the TCPOA and Joseph's continuing efforts to resolve the matter. There is, however, some dispute as to what else, beyond that subject, was discussed. Smith testified that he did not recall any discussion at the meeting of the time line for the closing of the sale of the property, much less an extension of that time line. However, Joseph testified that, after they discussed the engineering and due-diligence work he still needed to complete before the sale could go forward, he told Smith he could accomplish the work "between November and December," and, he alleges, Smith told him in reply to "try to keep it . . . in *645 November, but as early in December as possible."
Joseph subsequently prepared another addendum to the contract changing the closing date to "on or before December 17, 2004." The addendum was dated October 8, 2004, and was signed by Joseph. Although it was sent to and received by the property owners, they neither signed it nor advised Joseph that they objected to its terms.
Paul Smith testified that neither he nor any of the other property owners agreed to delay the closing date to November or December. Smith did state that, after Hurricane Ivan struck the Alabama Gulf coast on September 16, 2004, he orally agreed to extend the closing 30 days until October 28, 2004, because of the damage in the area. However, Joseph denies that such an extension was ever discussed or granted. Regardless, Joseph continued in his attempts to resolve the easement dispute and with his due-diligence investigation of the property.
On approximately November 15, 2004, Miller Acquisitions & Developments ("MAD") offered to purchase the same 14.5 acres of land the property owners had previously agreed to sell to Joseph. MAD offered to pay $1,036,750 for the property, compared to the $580,000 Joseph had agreed to pay. On November 24, 2004, Paul Smith telephoned Joseph and told him that one of the property owners, M.H. Smith, Jr., considered the sales contract the property owners had entered into with Joseph expired. Joseph immediately sent Paul Smith written notice indicating that he was ready, willing, and able to close on the property as soon as possible. Multiple times over the next several weeks he repeated his request that they close as soon as possible.
On December 16, 2004, the property owners signed a contract agreeing to sell the property to MAD for $1,036,750. The contract stated that the previous agreement to sell the property to Joseph was void, but provided that the contract between the property owners and MAD would be considered only a "backup" contract until the matter of the property owners' contract with Joseph was completely resolved.
For the rest of December and January, the parties attempted to resolve the matter. The property owners, other than M.H. Smith, indicated that they remained willing to sell the property to Joseph; however, M.H. Smith maintained that Joseph's contractual right to purchase the property had expired. On February 4, 2005, Joseph sued the property owners in the Baldwin Circuit Court seeking specific performance on the sales contract. The property owners answered, and MAD filed a motion to intervene, seeking a declaratory judgment and injunctive relief.
The trial court granted MAD's motion to intervene, and, at the close of Joseph's case-in-chief, both the property owners and MAD moved for a judgment in their favor on the basis that Joseph had failed to prove his case. The trial court granted the property owners' motion and entered a judgment in their favor and against Joseph.[1] Joseph appeals.[2]

*646 II.
The parties disagree as to the standard of review applicable to this case. The property owners argue that, because the trial court heard ore tenus testimony, this Court should apply the ore tenus rule and reverse the judgment of the trial court only if that judgment is "clearly erroneous or palpably wrong or unjust." Loper v. Odom, 619 So.2d 1310, 1312 (Ala.1993). Although acknowledging that the trial court's judgment was based on ore tenus testimony, Joseph nevertheless argues that this Court's standard of review should be de novo because, he claims, the facts before the trial court were essentially undisputed. See Eubanks v. Hale, 752 So.2d 1113, 1144 (Ala.1999) (stating that the ore tenus rule does not apply to questions of law when the material facts are not in dispute).
However, Joseph's argument overlooks the fact that the testimony at trial conflicted on several key points. Importantly, perhaps the most pertinent fact  to what date did, if any, the property owners agree to extend the deadline for Joseph to close on the transaction  was heavily disputed. Therefore, the ore tenus standard is appropriate.
In Transamerica Commercial Finance Corp. v. AmSouth Bank, N.A., 608 So.2d 375 (Ala.1992), this Court explained the standard of review appropriate in a case such as this one, where the trial court heard ore tenus testimony and then entered a judgment without making specific findings of fact and without explaining its rationale:
"Because the trial judge made no specific findings of fact, this Court will assume that the trial judge made those findings necessary to support the judgment. Fitzner Pontiac-Buick-Cadillac, Inc. v. Perkins & Assocs., Inc., 578 So.2d 1061 (Ala.1991). Under the ore tenus rule, the trial court's judgment and all implicit findings necessary to support it carry a presumption of correctness and will not be reversed unless `found to be plainly and palpably wrong.' Fitzner, 578 So.2d at 1063. `The trial court's judgment in such a case will be affirmed, if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment.' Clark v. Albertville Nursing Home, Inc., 545 So.2d 9, 13 (Ala.1989); see, also, Norman v. Schwartz, 594 So.2d 45 (Ala. 1991)."
608 So.2d at 378.
Thus, this Court must affirm the judgment in favor of the property owners unless the *647 judgment is "plainly and palpably wrong," that is, wholly without credible evidence to support it.

III.
The trial court did not explicitly state its rationale for entering a judgment for the property owners at the close of Joseph's case-in-chief. However, Joseph and the property owners essentially agree that the trial court's ruling was based on either a finding (1) that the sales contract expired when a closing had not occurred by October 28, 2004, or (2) that the oral agreement to extend the time frame for closing the purchase was unenforceable under the Statute of Frauds. If there is credible evidence in the record that would support either rationale, then, under the ore tenus standard of review, we must affirm the trial court's judgment. We first consider whether there was credible evidence to support a finding that the sales contract expired on October 28, 2004, when a closing did not occur by that date.
The sales contract Joseph submitted to the property owners on May 29, 2004, and ultimately signed by the property owners on June 28, 2004, stated that "[t]he sale shall be closed and the deed delivered on or before September 1, 2004, except seller shall have a reasonable length of time within which to perfect title or cure defects in the title to the property." The conditions of acceptance dated June 28, 2004, further stated that the "purchaser has 90 days to close under the terms of the contract including addendum A." When asked about the closing date at trial, Paul Smith testified as follows:
"Q: When was the closing to take place under this contract?
"A: Originally, it was to take place 90 days from May 29th. When we signed on June 28th, he asked if we would let that start from June 28th and let it be 90 days from there and we agreed to give him that additional time.
"Q: So under the strict terms of the agreement, the closing should have taken place, if everything went the way it should, 90 days thereafter, which would have been September 28th or 29th, right?[3]
"A: Well, 90 days from June whatever date we signed.
"Q: 28th?
"A: Yes."
Paul Smith also testified that the property owners allowed Joseph an additional 30 days within which to close after Hurricane Ivan struck the Orange Beach area, thus extending the closing date from September 28, 2004, until October 28, 2004.[4]
Joseph, however, argues that the sales contract never had a 90-day closing requirement. He notes that although his original offer indicated that closing would take place by September 1, 2004, it also provided for "a reasonable length of time" beyond that date in order to cure defects in the title to the property. Moreover, he argues in his reply brief that the provision in the conditions for acceptance stating that the "purchaser has 90 days to close under the terms of the contract" was handwritten and signed only by Paul Smith; there is no indication, he argues, that he agreed to that condition. This assertion, *648 however, is contradicted by his complaint, which states, in pertinent part:
"Under the terms of the `conditions of acceptance' contained in the sales contract, the purchaser, the plaintiff herein, had 90 days from June 28, 2004, to close under the terms of the contract. Accordingly, the original closing date was to have been September 24, 2004[sic]."
Regardless, however, of the original closing date contemplated by the parties, Joseph testified that Paul Smith subsequently agreed to delay the closing date until December 17, 2004:
"Q: At any time in [the September 10, 2004,] meeting did Mr. Smith tell you that you had to close by September 28th?
"A: No. I provided him an acknowledgment, the fact that, look, if I'm going to spend the time, the money, and the effort to proceed to fulfill my obligation under the contract, that I felt that I could accomplish it between November and December, late November until December. Of course, this is before the hurricane came.
"Q: Was that discussed?
"A: Yes, it was. He asked me if I could, you know, try to keep it as  you know, in November, but as early in December as possible. And I told him I'd do everything I could.
"Q: Alright. And you prepared this addendum, which is marked as Defendant's Exhibit 3. I know it's never been signed, but did you present that to him?
"A: Yes, I did."
The proposed addendum, which Joseph alleges extended the date as agreed, is dated October 8, 2004, and purports to extend the closing date until December 17, 2004. It is not signed by any of the property owners, although Joseph claims they never formally rejected it. Joseph also denies that there was ever any discussion about an extension to the closing date because of the damage to the area caused by Hurricane Ivan.
The contradictory testimony of Joseph and Paul Smith cannot be reconciled. However, this Court need not determine whose testimony is more credible; that is the province of the trial court. Our sole concern is whether there was evidence in the record from which the trial court could have concluded that the closing date for the sale of the property was October 28, 2004. Clearly, based on the testimony of Paul Smith, there was.
Even though we are assuming that the parties agreed to a closing date of October 28, 2004, we must still consider whether the contract automatically expired if the transaction did not close by that date. The property owners argue that the contract expired on October 28, 2004, because, they say, time was of the essence in the transaction. They acknowledge that the contract did not have a provision stating that time was of the essence, but they argue that the circumstances surrounding the transaction nevertheless made time of the essence. In support of this argument they cite Moore v. Lovelace, 413 So.2d 1100, 1102 (Ala.1982), in which this Court stated:
"It is an axiom of equity that as a general rule time is not of the essence of a contract. Gay v. Tompkins, 385 So.2d 973 (Ala.1980). However, the parties might make time essential by `clear manifestation of the intent of the parties in the contract itself, by subsequent notice from one party to the other, by laches in the party seeking to enforce it, or by change in the value of the land or other circumstances which would make a *649 decree for the specific performance inequitable.' Isom v. Johnson, 205 Ala. 157, 158, 87 So. 543, 544 (192[0]) (quoting Barnard v. Lee, 97 Mass. 92 (1867))."
The property owners argue that they manifested their intent that time was of the essence (1) by providing in the sales contract that Joseph had 90 days from the execution of the contract in which to close (this was not, they argue, an open-ended contract); (2) by not signing, and therefore rejecting, Joseph's proposed addendum to extend the closing until December 17, 2004; and (3) by extending the closing date 30 days until October 28, 2004, thus demonstrating that closing by that date was essential. Joseph argues that the property owners never manifested an intent to make time of the essence, especially inasmuch as they never formally rejected his proposed addendum extending the time for closing.
The property owners rely on this Court's previous decisions in Moore and Isom v. Johnson, 205 Ala. 157, 158, 87 So. 543, 544 (1920), in support of their argument. In Moore, the buyer agreed to purchase two parcels of land from the sellers and to close on the sale by October 10, 1979. The sellers later granted the buyer two six-month extensions, which extended the closing date first to April 10, 1980, and then to October 10, 1980. The buyer subsequently sought three more extensions of the closing date, but the sellers refused any more extensions. When the buyer failed to close by October 10, 1980, the sellers refused to complete the transaction thereafter. The trial court denied the buyer's ensuing action seeking specific performance, and this Court affirmed that judgment, stating:
"We agree with the trial court's finding that `it is clear that the [buyer] knew, or should have known, by [the sellers'] actions, that the [sellers] were demanding strict adherence or compliance with the terms of the contract.' The granting of the six-month extension made time of the essence. And, under the terms of the contract, the sellers had the right to cancel, at their election, upon the failure of the [buyer] to carry out the terms of the agreement."
413 So.2d at 1103.
In Isom, the buyer agreed to purchase a parcel of land from the seller and to close on the transaction by December 1, 1919. The seller later agreed to extend the closing date and stated he would accept payment "any time during December." 205 Ala. at 159, 87 So. at 544. The buyer failed to tender payment during December and, when the seller thereafter refused to complete the transaction, the buyer sued, seeking specific performance on the contract. The trial court ruled in the buyer's favor; however, this Court reversed, stating "[t]he new agreement averred, extending the time in which the [buyer] might pay, must be accepted as evidence that payment within the month of December was considered to be essential." 205 Ala. at 159, 87 So. at 544.
As previously discussed, the trial court heard conflicting evidence regarding the closing date but could reasonably have concluded that the property owners set the original closing date as September 28, 2004, and then changed it to October 28, 2004, because of the damage to the area caused by Hurricane Ivan. On the basis of Moore and Isom, the trial court could have therefore also reasonably concluded that the post-Hurricane Ivan agreement extending the closing to October 28, 2004, was "evidence that payment [by October 28, 2004,] was considered to be essential." Isom, 205 Ala. at 159, 87 So. at 544. Applying the ore tenus standard of review, we cannot say that the trial court's conclusion that time was of the essence to the *650 sales contract was plainly and palpably erroneous.
We have, therefore, concluded that the trial court had evidence before it from which it could have reasonably entered a judgment in favor of the property owners on the basis that the contract had expired on October 28, 2004. Therefore, it is unnecessary to consider the issue whether the trial court could have also entered a judgment on the basis that the oral agreement to extend the contract was unenforceable under the Statute of Frauds. However, we must still consider Joseph's argument that the trial court's judgment is erroneous because, he alleges, notwithstanding the fact that the specified closing date passed without the occurrence of a closing, the property owners still could not legally cancel the contract until they, first, provided him with evidence of marketable title, and, second, demanded that he close the sales transaction and gave him a reasonable amount of time to do so.
Joseph first cites Mid-State Homes, Inc. v. Brown, 47 Ala.App. 468, 471, 256 So.2d 894, 897 (1971), and Cullum v. Branch Bank at Mobile, 4 Ala. 21, 28-29 (1842), for the proposition that, unless otherwise agreed to, a seller of real property must discharge all encumbrances and present the buyer with a clear title before it can compel payment of the purchase price. Because the property owners had yet to resolve the easement issue with the TCPOA, Joseph argues, they had not presented him with a marketable title, and they could not, therefore, cancel or repudiate the contract.
However, Joseph has misapplied the holdings of Mid-State Homes and Cullum. Those two cases stand only for the proposition that a seller of real property cannot compel a buyer to make a payment pursuant to a real-estate contract until the seller has presented good title. The cases might be relevant if the property owners had tried to enforce the contract before the easement issue was resolved; however, as Joseph acknowledges in his next argument, the property owners never made any demand for payment. Moreover, the trial court's judgment is consistent with a finding that the contract expired by its terms, relieving the sellers of any duty to perform.
Joseph next cites Wilson v. Thompson, 255 Ala. 165, 169, 51 So.2d 20, 24 (1951), Bay Minette Land Co. v. Stapleton, 224 Ala. 175, 180, 139 So. 342, 347 (1932), and J.M. Ackley & Co. v. Hunter, Benn & Co.'s Co., 166 Ala. 295, 309, 51 So. 964, 968 (1909), for the proposition that a party cannot rescind a contract before calling upon the other party to close and giving the other party a reasonable time to comply with that request. This principle, Joseph alleges, applies to any contract, real estate or otherwise. Again, however, this argument is premised on the proposition that the property owners canceled or repudiated the contract, not that the contract expired in accordance with its terms. Moreover, this Court specifically stated in Bell v. Coots, 451 So.2d 268, 269 (Ala.1984), that this principle does not apply when time is of the essence in a contract; therefore, it is inapplicable in this case.
Finally, Joseph also argues that this Court should apply the doctrine of equitable estoppel to reverse the trial court's judgment because, he alleges, the property owners exhibited bad faith by inducing him to expend substantial time and effort conducting a due-diligence investigation and attempting to resolve the easement dispute while they were secretly negotiating with MAD for the sale of the same property. However, regardless of whether the property owners exhibited bad faith, Joseph never raised the issue of *651 equitable estoppel in the trial court.[5] "This Court cannot consider arguments advanced for the purpose of reversing the judgment of a trial court when those arguments were never presented to the trial court for consideration or were raised for the first time on appeal." State Farm Mut. Auto. Ins. Co. v. Motley, 909 So.2d 806, 821 (Ala.2005) (citing Crutcher v. Wendy's of North Alabama, Inc., 857 So.2d 82, 97 (Ala.2003)).

IV.
The trial court heard ore tenus evidence from which it could have reasonably concluded that Joseph's contract with the property owners expired as of October 28, 2004. Even if this Court might not have reached that same conclusion regarding the closing date, under the ore tenus rule we cannot substitute our judgment for that of the trial court. To do so would be to impermissibly reweigh the evidence. Ex parte Foley, 864 So.2d 1094, 1099 (Ala. 2003). Accordingly, the judgment of the trial court is affirmed.
AFFIRMED.
SEE, LYONS, HARWOOD, WOODALL, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
NOTES
[1] Although the trial court purported to enter "a judgment as a matter of law" in favor of the property owners, because the case was tried without a jury the judgment was actually a judgment on partial findings pursuant to Rule 52(c), Ala. R. Civ. P. ("If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue. . . ."). However, this Court has stated many times that "[t]he character of a pleading, or of a judgment or decree is determined from its essential substance, and not from its descriptive name or title." State v. Pettis, 275 Ala. 450, 451, 156 So.2d 137, 138 (1963). Therefore, the trial court's error is without effect, and we will treat the judgment in favor of the property owners as a judgment on partial findings entered pursuant to Rule 52(c).
[2] There was some question as to the date the trial court entered the judgment in favor of the property owners and, accordingly, whether Joseph's notice of appeal filed January 24, 2006, was timely. On February 6, 2006, the property owners moved this Court to dismiss Joseph's appeal as untimely. On Joseph's motion, this Court remanded the matter on March 2, 2006, for the trial court to consider Joseph's motion to extend the time for appeal pursuant to Rule 77(d), Ala. R. Civ. P. The trial court denied Joseph's motion. On July 18, 2006, this Court denied the property owners' motion to dismiss Joseph's appeal as untimely.

This Court remanded the case to the trial court for a second time on June 19, 2006, because MAD's claims were outstanding and the judgment being appealed from was therefore a nonfinal judgement. On July 6, 2006, the trial court dismissed MAD from the case, thereby making the judgment final on July 18, 2006.
[3] We note that 90 days from June 28, 2004, would actually be September 26, 2004; however, the parties apparently rounded the time period based on a 30-days-equal-1-month formula.
[4] Hurricane Ivan, a Category 3 hurricane, made landfall on September 16, 2004, near Orange Beach, causing significant property damage.
[5] The property owners argue that Joseph was required to plead equitable estoppel as an affirmative defense. Joseph concedes that equitable estoppel may be an affirmative defense to certain claims, but he argues that because he is the plaintiff in this case he had no obligation to plead any affirmative defenses under Rule 8, Ala. R. Civ. P. Nevertheless, Joseph could have raised the issue of equitable estoppel in the trial court but failed to do so.